## SHELTON v. PRICE.

### (District Court, N. D. Alabama, N. D. December 16, 1909.)

1. BANKRUPTCY (§ 182*)—ASSETS—FRAUDULENT TRANSFER—VACATION.

Under Bankr. Act July 1, 1898, c. 541, § 67e, 30 Stat. 564 (U. S. Comp. St. 1901, p. 3449), declaring invalid a transfer made by the bankrupt within four months prior to the filing of a petition in bankruptcy with intent to defraud his creditors "except as to purchasers in good faith and for a present, fair consideration," such a sale, in order to be sustained, must present both elements, namely, a purchaser in good faith and payment of a present, fair consideration.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 182.*]

2. BANKRUPTCY (§ 303*)—PREFERENCES—CONSIDERATION.

Evidence held to require a finding that a sale of a bankrupt's stock and fixtures in bulk for $5,000 presently paid by the buyer was based on a present, fair consideration.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 303.*]

3. BANKRUPTCY (§ 303*)—PREFERENCES—VACATION—BAD FAITH—BURDEN OF PROOF.

Where, in proceedings to set aside an alleged fraudulent conveyance of a bankrupt's stock and fixtures, it appears that the sale was made on a present adequate consideration, the burden of proof that the buyer purchased in bad faith was on those attacking the transfer.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 303.*]

───────────

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**4. BANKRUPTCY (§ 303\*)—FRAUDULENT TRANSFERS—SALES IN BULK.**

Under the present bankrupt act, a sale of the bankrupt's stock and fixtures in bulk is not, in an action by the trustee, prima facie fraudulent in the sense that such sale alone establishes the bad faith of the purchaser; the sale being merely a circumstance reflecting on the bona fides of the transaction.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 303.\*]

**5. BANKRUPTCY (§ 303\*) — PREFERENCES — SALES IN BULK — FRAUD—BUYER'S BAD FAITH—EVIDENCE.**

Evidence *held* insufficient to show that a buyer of a bankrupt's stock and fixtures in bulk within four months prior to bankruptcy was actuated by bad faith, or that he had knowledge, actual or constructive, of the bankrupt's intent thereby to defraud his creditors.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 303.\*]

Bill by M. B. Shelton, trustee of B. B. Garner & Co., bankrupts, against Charles H. Price to set aside a sale of the bankrupt's stock and fixtures as made with intent to defraud creditors. On final hearing. Bill dismissed.

Kirk, Carmichael & Rather, Cooper & Cooper, and Ashcraft & Bradshaw, for complainant.

Walker & Spraggins and Almon & Andrews, for defendant.

GRUBB, District Judge.. This was a bill in equity filed by the trustee of B. B. Garner & Co., bankrupts, by direction of the bankrupt court to have declared null and void a sale of the bankrupt's stock of goods and fixtures to the respondent, and restore the goods or the proceeds of the sale of them to the bankrupt estate for distribution among creditors, upon the ground that the sale was made with intent to defraud the creditors of the bankrupt, and that respondent knew or should have known of such intent. The issue is simplified by the express admission in the respondent's answer that the alleged fraudulent sale was made within four months prior to the filing of the petition in bankruptcy and while the bankrupt was insolvent, and, by the admission implied therein, from absence of any denial of the averment of the bill that the sale was made with the intent on the bankrupts' part to defraud their creditors. The sale so made would be null and void under section 67e of the bankrupt act (Act July 1, 1898, c. 541, 30 Stat. 564 [U. S. Comp. St. 1901, p. 3449]), "except as to purchasers in good faith and for a present, fair consideration." The important inquiry is whether the respondent is shown by the evidence in the record to have been a purchaser in good faith and for a present, fair consideration. Both elements must concur in order to uphold the sale as against the trustee.

The sale of the stock of goods and fixtures attacked by the bill was made in bulk and for an actual presently paid consideration of $5,000. Without extending the opinion by an analysis of the evidence relating to the fairness of the consideration paid, the conclusion reached by me is that the respondent paid a fair value for the goods purchased in view of their condition at the time of the purchase and the fact that he overbid another purchaser for them. When the consideration paid is shown by the record to have been adequate, the burden shifts to the

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep't Indexes

complainant to affirmatively show that respondent purchased in bad faith—i. e., that he knew of the intent of the bankrupt McSwine, who made the sale, to make it for the purpose of paying the debt owing by the bankrupt firm to his mother to the exclusion of the other creditors of the bankrupt; or was put on inquiry as to the existence of such intent on the bankrupt's part, and failed to prosecute such inquiry with the required diligence, the doing of which would have disclosed to respondent the existence of such fraudulent intent. Jones v. Simpson, 116 U. S. 614, 6 Sup. Ct. 538, 29 L. Ed. 742. Under the present bankrupt act, it does not seem to me that the purchase of a stock of goods and fixtures in bulk is prima facie fraudulent in the sense that proof of such sale alone answers the exigencies, of the burden imposed on complainant, of showing bad faith on respondent's part in purchasing. Houck v. Christy, 152 Fed. 612, 81 C. C. A. 602. It is merely a circumstance along with the other attendant circumstances of the sale reflecting on the bona fides of the transaction. The question for decision is whether the court is reasonably satisfied from the evidence in the record that the respondent was charged with the duty to discover the fraudulent intent of his vendor to use the proceeds of the sale for the purpose of paying one creditor to the exclusion of other creditors. If such duty rested upon respondent, before making the purchase, inquiry of the bankrupt McSwine would not answer the requisition in this respect. Inquiry from the bankrupt Garner, however, would, under the facts in this case, be on a different footing.

The facts attending the transaction, briefly stated, are as follows: The bankrupt firm consisted of two members, R. W. McSwine and B. B. Garner. At the time of the sale, the latter had withdrawn from the firm, and for some time, before his complete withdrawal, had been a salaried employé only and not a partner. He took no part in the sale and had no knowledge of it until after it was completed. He was an experienced groceryman, while McSwine was not. The business had not been a prosperous one, but at the time of the sale the firm was not under strenuous pressure from any of its creditors. Even the Merchants' Bank seems to have been induced to press its indebtedness only because of the suggestion of the bankrupt B. B. Garner, and not from any apprehension of its own as to its claim. No commercial creditors were pressing their claims or discontinuing credit. Had Garner remained with the firm, its business could have easily been continued until late in the spring without financial embarrassment or pressure. The immediate inducement to the sale may be fairly inferred to have been that B. B. Garner, the only experienced groceryman, severed his connection with the firm the first of the year; that the other member of the firm was incompetent to conduct the business of the firm without him, and was desirous of moving to Florida with his mother and stepfather. The evidence fairly shows that a sale had been contemplated and openly discussed in Florence by the bankrupt McSwine and his stepfather Wilson, speaking for him, for these anticipated reasons, for at least two months before the sale to respondent was made, and offers were solicited during that period both from respondent and others, and brokers were employed by McSwine and Wilson to procure a purchaser. This state of affairs was reasonably

well known in Florence for a considerable period before the sale. It seems clear that a bulk sale, attended by such circumstances, would not arouse suspicion of intending purchasers that it was a sale made in contemplation of insolvency by the vendors, and for the purpose of defrauding their creditors. Any suspicion arising from the offer to sell in bulk, and, so, out of the usual course of business, would be allayed by such generally known innocent reasons therefor. The reputation of the firm up to the time of the sale was not shaky. Garner was a man of integrity and known business capacity, while McSwine seems to have had an undeserved reputation of being a man of some means. It was not publicly known that Garner had left the firm until the time of the sale to respondent. The mere fact that the firm would likely owe mercantile debts, because of the character of its business, would not put upon inquiry an otherwise innocent purchaser, when the sale was publicly and not secretly made, and when there existed, known to the purchaser and the public, a sufficient and an innocent motive on the vendor's part for making the sale, and when there was current in Florence no rumor that the contemplated sale was due to the shaky financial condition of the firm or to the impossibility of its continuing the business because of pressure from its creditors. The evidence fails to disclose the existence of any suspicion in Florence as to the financial instability of the firm prior to the time of the sale. Indebtedness is not sufficient to create suspicion; it must be insolvency or indebtedness of a character likely to prevent the business from being conducted as a going concern. Simmons v. Shelton, 112 Ala. 294, 21 South. 309, 57 Am. St. Rep. 39.

Does the record show any facts within the peculiar knowledge of respondent, as distinguished from the public generally, that would put him on inquiry as to the fraudulent intent? The evidence shows that respondent was asked by McSwine or Wilson about December 1st to make an offer for the stock; that at one time respondent had been in the grocery business, and later and at the time of the sale had been engaged in buying secondhand stocks and disposing of them. Respondent had known B. B. Garner, one of the bankrupts, all his life, and was an intimate friend. McSwine, the other bankrupt, was a comparative stranger in Florence, and an acquaintance merely of respondent. Under such circumstances it does not seem unnatural that respondent should have informed Garner of the proposition of his partner, nor imply that respondent believed McSwine to be untrustworthy. Garner was reticent in his disclosures about the condition of the firm to respondent. He did not at that time tell him of his lack of interest in the stock or his contemplated severance of all relations with the firm. Considering his testimony with that of respondent, I do not think that it is affirmatively established that Garner disclosed any indebtedness of the bankrupt firm, except that to the Merchants' Bank and to Mrs. Wilson. He did inform him that he felt personally responsible for the payment of the bank's indebtedness, and believed that future collections of the firm would easily take care of it. Respondent conveyed to Garner the idea, in the first conversation, that he would not feel free to buy the stock unless Garner was protected. The only protection which Garner claimed to need was against the indebtedness

of the Merchants' Bank. Upon the second interview, Garner voluntarily told respondent that he was out of the business; that his matters were arranged, and it would be all right for respondent to buy the stock. Garner, having then no interest in the old firm or in the property sold, but only an interest to see it applied to the indebtedness of the firm, especially that of the Merchants' Bank, was a person upon whose information as to the condition of the bankrupt firm respondent could reasonably rely. Taking the two conversations together, I think respondent was reasonably assured by Garner that the only indebtedness of any consequence owing by the firm was that owing to the Merchants' Bank and to Mrs. Wilson, and that the bank's indebtedness had been satisfactorily arranged, so far as any disposition of the stock to respondent was concerned. While, as a matter of fact, the arrangement referred to by Garner was merely a promise by McSwine to pay the firm debts, upon Garner's withdrawal, I think a fair construction of the evidence shows that the character of the arrangement was not communicated to respondent by Garner, but only the fact that an arrangement of the bank's indebtedness, consistent with the purchase of the stock by respondent, had been effected. It seems to me that whatever suspicion as to the firm's indebtedness was created by the first talk between Garner and respondent was allayed by the second, and that respondent was justified in acting upon the assurance given him by Garner in the second talk.

Complainant contends that the circumstances under which the sale was made cast suspicion on the good faith of the purchaser, in that it was made hurriedly and without an inventory or examination of the firm's books; and that the consideration was paid in money. While it is true that the sale was negotiated in two days, it is also true that it had been under consideration by both parties in a general way for at least a month. The passing of Garner from the firm on December 28th, and his suggestion to respondent that he could now buy the stock, revived the idea of a purchase by respondent. When the negotiations were renewed, other purchasers from Sheffield were in conference with the bankrupt for the purchase of the stock, and this fact naturally stimulated the respondent to expedition. It was the presence of a competitive bidder for the stock, and not the necessitous condition of the bankrupt firm, that operated on respondent. Due time was taken to ascertain the value of the stock, and the sale was conducted openly. That secrecy was not intended appears from the fact that visible possession changed upon the execution of the bill of sale, and within half an hour thereof the cashier of the Merchants' Bank was in the store under circumstances that indicated that he was aware of the transfer. It is true that no inventory was taken by the purchaser, but a careful examination of the stock was made by the respondent and Kilburn both on Friday and Saturday before the sale was made. Respondent and Kilburn were both experienced grocerymen, and were not trained bookkeepers, and could better ascertain the value of a stock by examination and calculation, as they did, than by taking a formal inventory. Only the stock was purchased and not the accounts, and so no examination of the books would naturally occur to the respondent as being necessary; especially in view of the fact that

he was not a trained bookkeeper. His experience in handling secondhand stocks is important, both as qualifying him to quickly appraise the value of this stock and as constituting him a natural bidder for it. It is not intimated that he was influenced in making the purchase by any other motive than the profit to be obtained on resale, and it is hardly probable that such a purchaser would fail to investigate the value of the stock sufficiently before purchasing. The payment in money, rather than by check, was unusual, and, unexplained, would be suspicious. The unpleasant relations between Wilson and the bank with which the respondent did business is proven by the evidence of Elting. The objection by Wilson to a check on respondent's bank on this ground is testified to by respondent, and not disputed. It is true the bankrupt could have deposited the check in his own bank, but in that case would probably desire certification of it by respondent's bank. If the purpose of a money payment had been to conceal the transaction from the Merchants' Bank, it could have been accomplished as well by taking respondent's check and cashing it at the bank on which it was drawn. As a matter of fact, the transaction was not attempted to be kept secret, for the record tends to show that a number of nonparticipating persons, including the cashier of the Merchants' Bank, learned of it within less time than an hour from the execution of the bill of sale. It is true, also, that the respondent began the sale of the goods at retail and wholesale, immediately on being put into possession. But this was done openly and with no purpose to make away with the stock, and was consistent with the object of the purchase, which was to resell the goods, at once, to merchants and at retail, for the purpose of realizing on them.

It is also contended that the known purpose of the bankrupt McSwine to go to Florida should have put the respondent on notice that he intended to abscond with the purchase money. No immediate departure was in contemplation; on the contrary, the bankrupt, as a part of the sale agreement, reserved the right to desk room in the store, for the purpose of collecting the accounts due the bankrupt firm, which implied a continued residence in Florence of some duration. The fact that another bidder for the stock was present on the day of the sale, and that respondent was told by the bankrupt McSwine that he would not consider a bid from him until the other bidder had been disposed of, tends to show that respondent paid a fair value for the stock, and bought under circumstances that would disarm suspicion.

The evidence convinces me that respondent had no other motive in purchasing than a profit on resale; that he bought a stock that had been offered for sale in bulk for a month or more, and was being offered then for an assigned reason that would reasonably disarm suspicion of fraud; that many of the circumstances under which the purchase was made were calculated to allay, rather than to arouse, suspicion in a purchaser; and all are reasonably explained consistently with the good faith of the purchaser. This case, in its facts, seems to me more analogous to the case of Simmons v. Shelton, 112 Ala. 284, 21 South. 309, 57 Am. St. Rep. 39, than to that of Houck v. Christy, 152 Fed. 612, 81 C. C. A. 602.

My conclusion is that the respondent did not have actual knowledge

of any intent on his vendor's part to defraud his creditors, and was not charged with notice thereof from the circumstances. The bill is therefore dismissed, at the complainant's costs.